IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02604-REB-CBS

PHELPS OIL AND GAS, LLC, on behalf of itself
and a class of similarly situated royalty owners,

       Plaintiff,

v.

NOBLE ENERGY, INC. and
DCP MIDSTREAM, LP,

       Defendants.

---

## NOBLE ENERGY, INC.'S MOTION FOR SUMMARY JUDGMENT

---

       Defendant Noble Energy, Inc. ("Noble"), pursuant to Fed. R. Civ. P. 56, moves

for summary judgment on all of Plaintiff's claims against Noble.

### INTRODUCTION

       Plaintiff Phelps Oil and Gas, LLC ("Phelps") is a royalty owner in several Noble

wells in the Wattenberg Field in northern Colorado.  Phelps claims additional royalties

based on an audit Noble performed of DCP Midstream, LP ("DCP"), a purchaser and

gatherer/processor of its natural gas.  Based on the audit, Phelps contends that DCP

should have made additional payments to Noble during a period ending December 31,

2009, and that Noble should have made additional royalty payments to Phelps.  It is

undisputed that DCP made no cash payment to Noble to resolve the audit claims.

       Noble is entitled to summary judgment for two basic reasons.  <u>First</u>, Phelps has

no interest in most of the audit claims because those claims were released, are barred

by the statute of limitations, or do not concern wells on which Phelps is paid royalties.

Second, Noble settled these audit claims with DCP in exchange for contract modifications that substantially increased future revenue for Noble and its royalty owners, and Phelps cannot show that this settlement was made in bad faith or was patently imprudent.

## STATEMENT OF UNDISPUTED FACTS

### *Noble's Natural Gas Production in the Wattenberg Field*

1.      Noble produces natural gas and associated natural gas liquids ("NGLs") from leases in the Wattenberg Field in Adams, Boulder, and Weld Counties in Colorado. (First Am. Compl. ¶¶ 21-22.)

2.      DCP purchases, gathers, and/or processes a majority of Noble's natural gas produced in the Wattenberg Field pursuant to percentage of proceeds ("POP") contracts.  (*Id.* ¶ 25.)

3.      Under the POP contracts, Noble receives a share of the proceeds on the sale of all of its natural gas and NGLs.  (*Id.* ¶ 26.)

4.      DCP is the primary purchaser of Noble's natural gas and NGLs from the leases in this case.  (Sigdestad Dep., excerpted at Ex. A, 18:6-19:7, 21:5-22:18, 125:8-25.)

### *The* Holman *Lawsuit and Settlement Concerning Noble's Payment of Royalties*

5.      In 2003, Jack and Dorothy Holman filed a lawsuit against Noble, captioned *Jack Holman, et al. v. Noble Energy Production, Inc., et al.* (f/k/a *Jack Holman, et al. v. Patina Oil & Gas Corporation*), Case No. 03-CV-9, in the Weld County, Colorado District Court. The *Holman* plaintiffs alleged that Noble had improperly charged them fees for

gathering, processing, and transportation of natural gas, and as a result, had underpaid royalties on production from the Wattenberg Field.  (*Holman* Compl., attached as Ex. 1 to Henderson Decl. (Ex. B), ¶¶ 5, 18-19.)

6.     After several years of litigation, Noble and the *Holman* class members ("Class Members") agreed to a settlement on or around February 15, 2007 (the "*Holman* Settlement," attached as Ex. 2 to Henderson Decl.).

7.     The Class Members released Noble from

> any and all of the claims, causes of  action, demands, obligations,  actions, liabilities  and damages of ever   y  kind  and nature what  soever,  whether known  or unknown, whether  foreseen or unforeseen,  in law or in equity, that  are based on the calculation,   payment and reporting  of Royalties to the Settlement Class Members … arising on or prior to the Effective Date, which are, or could have been, the subject of the Civil Actions ….

(*Id.* ¶¶ 1(mm), 11(b).)  The Effective Date is July 26, 2007.  (Henderson Decl. ¶¶ 6-9.)

8.     The Holman Settlement includes a "Future Royalty Calculation Method," effective January 1, 2008, under which Noble agreed to pay the Class Members royalties on 100% of cash payments received from the sale of natural gas and NGLs, and on 50% of the value of volumes retained by the post-wellhead service provider, used up during production, or otherwise lost and unaccounted for.  (*Holman* Settlement ¶ 6.)  Noble has complied with these terms.  (Nedelka Decl., Ex. C, ¶¶ 5-6.)

9.     The *Holman* Settlement authorized Noble to modify or enter into new gas sales contracts, including POP contracts, at Noble's "sole discretion" and "without notice to the Settlement Class Members."  (*Holman* Settlement ¶ 12.)

10.     Phelps asserts that it was a "named plaintiff in the [*Holman*] class action, and a member of the [*Holman*] settlement class."  (First Am. Compl. ¶ 3.)  Phelps claims that it

has received royalties from Noble "for many years" under a royalty agreement that is "covered under the [*Holman*] class settlement."  (*Id.* ¶ 15.)

### Noble's Audit of DCP Concerning Potential Underpayments

11.     In 2008, Noble commissioned an audit of DCP that identified potential underpayment or under-allocation issues concerning Noble's natural gas and NGLs (the "DCP Audit," attached as Ex. 1 to Sigdestad Decl. (Ex. D)).  The DCP Audit identified 11 distinct issues or claims, each of which affected only a certain subset of wells operated by Noble in the Wattenberg Field.[1]

12.     The audit claims related to three categories of POP contracts:  Wellhead Purchase Contracts ("Ygrade Contracts"); Ethane Allocated Contracts; and a Fixed Recovery Contract.  (*Id.* at 4-5.)

13.     Phelps had an interest in only five Noble wells that produced during the audit period and that were potentially subject to the audit claims.  (Nedelka Decl. ¶¶ 8-13.)

14.     Phelps's wells are governed by two POP contracts:  a Ygrade Contract and the Fixed Recovery Contract.  (Barrow Decl., Ex. E, ¶ 6.)  None of Phelps's five relevant wells were subject to an Ethane Allocated Contract.  (*Id.* ¶ 7.)

15.     Some of the potential underpayments in DCP Audit Claim Nos. 1, 2, 3, 4, and 10 concerned Ygrade Contracts; others concerned only Ethane Allocated Contracts. (Sigdestad Decl. ¶ 5 and Ex. 1 at 10, 13-15, 22.)

---

[1] The Declaration of Cristina Sigdestad (Ex. D) summarizes each audit claim.

16.     Claim No. 4 only applied to gas processed and sold at the Spindle Gas Plant. (*Id.* at 5 and Ex. 1 at 15-16.)  It is unlikely that any of the natural gas or NGLs from Phelps's wells was processed at the Spindle Gas Plant.  (Barrow Decl. ¶ 10.)

17.     Claim No. 5 concerned only natural gas and NGLs processed through the "EPL Facilities."  (Sigdestad Decl. ¶ 5 and Ex. 1 at 16-19.)  None of Phelps's wells was connected to the EPL Facilities.  (Barrow Decl. ¶ 9.)

18.     Claim Nos. 6, 9, and 10 related only to potential underpayments arising prior to July 26, 2007.  (Sigdestad Decl. ¶ 5; Smith Dep., excerpted at Ex. F, 47:5-48:23.)

19.     Claim No. 8 concerned whether DCP charged Noble a fractionation fee for volumes that were not actually fractionated by DCP.  (DCP Audit at 20-21.)

20.     Noble dropped Claim No. 8 when it learned that DCP had retroactively adjusted the fees.  (Sigdestad Decl. ¶ 5; Smith Dep. 45:22-47:4.)

21.     Claim No. 11 (the "Unquantified Claim") was based on Ygrade and Ethane Allocated Contracts that included a definition of "Plant Products" specifying the "drip" retained by DCP as that "collected in and … removed from [DCP's] Gathering System upstream of the inlets to the Gas Plants."  (Sigdestad Decl. ¶ 5 and Ex. 1 at 7.)

22.     The only Ygrade Contract relevant to Phelps's wells does not contain the language upon which Claim No. 11 is based.  (*See* WEL0177000 Contract, Dkt. No. 24–58, at 3.)

23.     Claim Nos. 1, 2, 3, and 11 concern what would be considered "lost and unaccounted for" volumes of natural gas and NGLs.  (Sigdestad Decl. ¶ 5.)

***Noble's Settlement with DCP***

24.     On July 8, 2009, Noble sent a report to DCP concerning the issues identified in the DCP Audit.  (First Am. Compl. ¶ 52; Sigdestad Dep. 79:9-20.)

25.     DCP objected to the potential underpayment issues identified in the audit and maintained that it had not underpaid Noble.  (*See* discussion of opposition to audit claims at Smith Dep. 33:23-50:11 and Sigdestad Decl. Ex. 4.)

26.     Over a period of nine months, Noble and DCP negotiated to resolve the DCP Audit issues.  (Smith Dep. 32:11-33:15, 85:1-21.)  Some of the audit claims were modified based on new information provided by DCP.  (Sigdestad Dep. 115:2-8.)  After accounting for these adjustments, the amount of the potential underpayments identified in the DCP Audit was ███████████████████.  (*See* Ex. 1 to Nedelka Decl.)

27.     Noble believed that DCP would never consider a cash settlement for the DCP Audit issues.  (Sigdestad Dep. 118:17-24.)

28.     After extensive negotiations with DCP, Noble determined in its business judgment that the best available option for it and its royalty owners was to recover any potential underpayments from DCP on a going-forward basis.  (Sigdestad Dep. 125:8-25, 128:13-22, 129:8-16, 136:10-16.)

29.     On March 16, 2010, Noble and DCP entered a settlement agreement to resolve the issues identified in the DCP Audit (the "DCP Settlement").

30.     ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

31.     All royalty owners, including Phelps, have been and continue to be paid increased royalties under the renegotiated POP contracts as a result of the DCP Settlement.  (Sigdestad Dep. 126:24-127:15.)

32.     ████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

33.     Royalty owners, including Phelps, will be paid increased royalties as a result of the infrastructure and production-capacity improvements made by DCP under the DCP Settlement.  (Sigdestad Dep. 128:13-129:16, 136:10-16.)

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, *Koch v. Shell Oil Co.*, 52 F.3d 878, 880 (10th Cir. 1995), and should be granted "against a party who fails to make a showing sufficient to establish … an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

### I.     THE *HOLMAN* SETTLEMENT AND APPLICABLE STATUTE OF LIMITATIONS BAR MOST OF PHELPS'S CLAIMS.

Phelps assumes that Noble must pay royalties to Phelps on its "share" of all potential underpayments identified in the DCP Audit███████████████████.  But much of the DCP audit concerned a period when Phelps has no claim because of (i) the

release in the *Holman* Settlement and (ii) the statute of limitations.  Phelps is not entitled

to any royalties based on alleged underpayments prior to August 7, 2008.

> **A.**     **All claims for royalty payments arising on or before July 26, 2007**
> **were released in the *Holman* Settlement.**

The DCP Audit identified potential underpayments on gas produced between

October 2005 and December 2009.  But Phelps released "any and all claims" against

Noble relating to the "calculation, payment and reporting of [r]oyalties" arising on or

before July 26, 2007 in the *Holman* Settlement.  Phelps may not recover royalties based

on alleged underpayments by DCP to Noble prior to this date.

"A release is the relinquishment of a vested right or claim to a person against

whom the claim is enforceable."  *Neves v. Potter*, 769 P.2d 1047, 1049 (Colo. 1989);

*see also* Restatement (Second) of Contracts § 284.  A plaintiff is barred from asserting

claims that are subject to a valid release.  *See Bauer v. Aspen Highlands Skiing Corp.*,

788 F. Supp. 472, 475 (D. Colo. 1992).

The *Holman* Settlement released all claims for unpaid royalties arising on or

before the Effective Date:

> Release  by Settlement Class Member   s.  Upon the   occurrence of the
> Effective Date and the releas e of the Settlement Funds from the Escro w
> Account  pursuant to paragraph 9 of   the Final Judgment, the Settlement
> Class Members, and each of   them … forever releases and discharges
> Noble … from any and all Settled Claims ….

(*Holman* Settlement ¶ 11(b).)  The "Settled Claims" are:

> [A]ny  and all of the claims, causes       of  action, demands, obligations,
> actions,  liabilities and damages of     every kind and nature whatsoever,
> whether known or unk nown, whether foreseen or unf oreseen, in law or in
> equity,  that are based on the calcul      ation,  payment and reporting of
> Royalties  to the Settlement Class Mem  bers … arising on or prior to the

Effective Date, which are, or coul d have been, the subject of the Civil Actions ….

*Id.* at ¶ 1(mm).  The Effective Date is July 26, 2007.  (Henderson Decl. ¶¶ 6-9.)

The majority of the DCP Audit claims— ████████████████████████

████████████████████—concerns production prior to July 26, 2007.  (*See* Nedelka Decl. Ex. 1.)  Three of the 11 audit claims—Nos. 6, 9, and 10—exclusively concern potential underpayments prior to this date.  (*See* Sigdestad Decl. ¶ 5; Smith Dep. 47:5-48:23.)  Phelps is barred from recovering royalties for any underpayments by DCP prior to July 26, 2007.

**B.    All claims for royalties arising prior to August 7, 2008 are barred by the statute of limitations.**

The statute of limitations to "recover a liquidated debt or an unliquidated, determinable amount of money" is six years.  § 13-80-103.5(1)(a), C.R.S.  And "[a] cause of action for debt, obligation, money owed, or performance shall be considered to accrue on the date such debt … becomes due."  § 13-80-108(4), C.R.S.  Applying these statutes, the Colorado Supreme Court has held that a claim for underpayment of royalties accrues on the date that royalties were due rather than upon discovery of underpayment.  *See BP Am. Prod. Co. v. Patterson*, 185 P.3d 811, 814 (Colo. 2008).  Phelps may argue that the statute of limitations should not bar its claims because it was unaware of the underpayment issues until recently, but this argument was rejected in *Patterson.*  185 P.3d at 814.

Phelps filed its original Complaint in state court on August 7, 2014.  Any claim for unpaid royalties arising prior to August 7, 2008 is barred by the statute of limitations.  Of

the ████████ in potential underpayments identified in the DCP Audit, approximately

████████ accrued prior to August 7, 2008 and are time-barred.  (Nedelka Decl. Ex. 1.)

## II.   CLAIMS RELATING TO LOST AND UNACCOUNTED FOR VOLUMES OF GAS AND LIQUIDS WERE RESOLVED IN THE *HOLMAN* SETTLEMENT.

Four of the audit claims concerned DCP's failure to pay Noble for volumes of

natural gas and NGLs retained by DCP, consumed during production, or otherwise lost

and unaccounted for.  But Phelps agreed in the *Holman* Settlement to be paid royalties

on 50% of the value of such volumes, and Noble has paid these royalties.  Phelps's

claim for any unpaid royalties on those volumes is barred by the *Holman* Settlement.

The *Holman* plaintiffs "alleged that Noble and its predecessors breached the

[mineral] [l]eases by failing accurately to calculate and pay [r]oyalties by improperly

deducting Post-Wellhead Expenses," including the value of lost and unaccounted for

volumes of natural gas and NGLs.  (*Holman* Settlement at 1.)  The parties resolved that

dispute when Noble agreed to "pay Royalties on 50% of the value of the Fuel and Other

Lost Volumes measured and accounted for by the average price paid to Noble for

Residue Gas" from the Effective Date forward.  (*Id.* at 14-15, ¶ 6(a)(iv).)  Such "Fuel and

Other Lost Volumes" includes:

> [G]as used by a provider of Post-We llhead Services as fuel and all other
> losses of production volumes (whether through the use of gas or liquids as
> fuel; through line loss, flaring or venti ng; or through the retention of drips
> by  the provider, or whether other  wise  lost or unaccounted for) incurred
> between  the  Initial Meas urement  Point and the M  ainline  Transmission
> Inlet ….

(*Id.* at 14, ¶ 6(a)(iv).)  In other words, Noble agreed to pay, and royalty owners agreed

to accept, a royalty on the residue gas value of 50% of all volumes of natural gas and

NGLs based on the difference between the volumes measured at the wellhead and those actually sold for Noble's benefit.  Noble has paid Phelps royalties on such volumes since July 26, 2007.  (Nedelka Decl. ¶¶ 5-6.)  Phelps thus waived any claim it may have otherwise asserted for royalties on lost and unaccounted for volumes of natural gas and NGLs.  *See In re Marriage of Hill*, 166 P.3d 269, 273 (Colo. App. 2007) ("Waiver may be express, as when a party states its intent to abandon an existing right, or implied, as when a party engages in conduct which manifests an intent to relinquish the right or acts inconsistently with its assertion.").

Four of the DCP Audit claims concerned lost and unaccounted for volumes of natural gas and NGLs.  Claim Nos. 1 and 2 concerned ███████████████████ ███████████████████████████.  (Sigdestad Decl. ¶ 5 and Ex. 1 at 10-14.) Similarly, Claim No. 11 concerned DCP's retention of drip recovered at the gas plants. (*Id.* ¶ 5 and Ex. 1 at 6-9.)  Claim No. 3 was based on ███████████████████ ███████████████████████████.  (*Id.* ¶ 5 and Ex. 1 at 14-15.)  Each of these claims concerned volumes of natural gas and NGLs that were retained by DCP without payment to Noble.  (*Id.* ¶ 5 and Ex. 1 at 6-15.)

The *Holman* Settlement required Noble to pay royalties to Phelps on these volumes even though Noble itself was not paid, and Phelps was paid on that basis. Phelps is not entitled to additional royalties on lost and unaccounted for volumes, and Phelps's claim for any alleged underpayments based on DCP Audit Claims Nos. 1, 2, 3, and 11 should be dismissed.

**III.    MOST OF THE REMAINING AUDIT ISSUES DO NOT AFFECT PRODUCTION IN WHICH PHELPS HAS AN INTEREST.**

The DCP Audit identified eleven underpayment issues.  These issues relate to specific gas sales contracts, and gas passing through specific pipelines or processing plants.  Most of the underpayment issues identified in the DCP Audit do not affect production from the Phelps wells.  A plaintiff lacks standing to pursue a claim for which he has no interest.  *See Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004) (standing requires plaintiff to have suffered an injury-in-fact to a legally protected interest).

The DCP Audit concerned three categories of POP contracts:  Ygrade Contracts, Ethane Allocated Contracts, and a Fixed Recovery Contract.  (Sigdestad Decl. Ex. 1 at 4-5.)  Phelps's wells were governed by two contracts—a Ygrade Contract and the Fixed Recovery Contract.  (Sigdestad Dep. 22:19-23:2; Barrow Decl. ¶ 6.)  None of Phelps's wells was subject to the Ethane Allocated Contracts.  (Barrow Decl. ¶ 7.)  Distinct portions of Claims Nos. 1, 2, 3, 4, and 10 concern only Ethane Allocated Contracts.  (Sigdestad Decl. ¶ 5 and Ex. 1 at 10-15, 22.)  Because Phelps was not paid royalties under Ethane Allocated Contracts, Phelps has no standing to recover royalties on these alleged underpayments.

Claim No. 4 only concerned gas processed and sold at the Spindle Gas Plant.  (*Id.* ¶ 5 and Ex. 1 at 15.)  It is unlikely that any of the natural gas or NGLs from Phelps's wells was processed at the Spindle Gas Plant.  (Barrow Decl. ¶ 10.)  Phelps lacks standing to assert any claim for such underpayments.

Claim No. 5 alleged that DCP failed to apply contractual discounts for excess line pressure under the Fixed Recovery Contract for natural gas and NGLs processed only

through the "EPL Facilities."  (Sigdestad Decl. ¶ 5 and Ex. 1 at 16-19.)  None of the

Phelps wells was connected to the EPL Facilities.  (Barrow Decl. ¶ 9.).  Thus, Phelps

cannot claim royalties on this basis.

Claim No. 8 concerned DCP charging Noble a fractionation fee for NGLs that

were not fractionated by DCP.  (DCP Audit at 20-21.)  This claim was dropped because

DCP retroactively corrected these fees.  (Sigdestad Decl. ¶ 5; Smith Dep. 45:22-47:4.)

Finally, Claim No. 11 concerned DCP's retention of drip under Ygrade and

Ethane Allocated Contracts within the boundaries of the processing plants.  (Sigdestad

Decl. ¶ 5.)  The basis for this audit claim was that many Ygrade and Ethane Allocated

Contracts included a definition of "Plant Products" that described the "drip" that was

retained by DCP as only that "collected in and … removed from [DCP's] Gathering

System upstream of the inlets to the Gas Plants."  (*Id.* ¶ 5 and Ex. 1 at 7.)  But the only

Ygrade Contract for Phelps's wells omits the language upon which Claim No. 11 was

based (WEL0177000 Contract at 3).  Therefore, Phelps was not affected by this claim.

Phelps has no standing to assert claims for additional royalties arising from Claim

Nos. 4, 5, 8, and 11, or the portions of Claim Nos. 1, 2, 3, and 10 relating to Ethane

Allocated Contracts.  (*See* Nedelka Decl. Ex. 1.)

## IV.  PHELPS'S REMAINING CLAIMS FAIL BECAUSE THE SETTLEMENT WAS NOT PATENTLY IMPRUDENT AND NOBLE DID NOT ACT IN BAD FAITH.

All Phelps's remaining claims for unpaid royalties fail on their merits.  Phelps

asserts claims for breach of contract and breach of the implied duty of good faith and

fair dealing.  (*See* First Am. Compl. ¶¶ 60-69.)  But Phelps identifies no contract term

breached by Noble.  (*Id.*; Phelps Dep., excerpted at Ex. H, 113:8-23.)  Instead, Phelps's

claims depend on Noble's breach of an implied covenant.  The *Holman* Settlement requires Noble to pay royalties on 100% of the payments Noble actually receives from the sale of its natural gas and NGLs, and on 50% of volumes retained by DCP, consumed during production, or that is otherwise lost and unaccounted for.  (Nedelka Dep., Ex. I, 17:18-18:25; First Am. Compl. ¶ 18.)  It is undisputed that Noble has complied with these terms.  Phelps contends, however, that Noble *should have* recovered approximately ▮▮▮▮▮▮ in the DCP Audit, and now must compensate Phelps for royalties that would have been paid on that amount, *as if Noble had actually recovered the entire* ▮▮▮▮▮ *and never settled with DCP*.  (*See* First Am. Compl. ¶¶ 59, 62, 66-67; Pl.'s Resps. to Noble's Interrogs. Nos. 14 and 15, Ex. J.)  Phelps essentially asks the Court to set aside Noble's business judgment and ignore the DCP Settlement.  However, "[i]t is not the place of courts, or lessors, to examine in hindsight the business decisions of a gas producer."  *Robbins v. Chevron U.S.A., Inc.*, 785 P.2d 1010, 1015 (Kan. 1990).

To establish that Noble breached an implied covenant to Phelps when it entered the DCP Settlement, Phelps must show that Noble acted in bad faith in negotiating or entering the settlement, or that the settlement terms were so patently imprudent that bad faith is implied.  Phelps has not alleged, and cannot prove, either contention.

### A.  The *Holman* Settlement gave Noble the "sole discretion" to modify the POP contracts.

The *Holman* Settlement provides that Noble may undertake certain actions in its sole discretion:

> Neither the Final Judgment nor this Agreement will be interpreted or construed as preventing or limiting Noble's ability, at its sole discretion and without notice to the Settlement Class Members, to enter into new contracts for Post-Wellhead Services, including gathering, transportation, processing or marketing arrangements relating to the Leases, or to modify existing gathering, transportation, processing or marketing arrangements relating to the Leases ….

(*Holman* Settlement ¶ 12.)  The DCP Settlement involved modification of the post-wellhead services contracts between Noble and DCP.  As such, Noble was acting within its sole discretion when it negotiated and entered into the DCP Settlement.

In *Continental Potash v. Freeport-McMoran*, overriding royalty-holding plaintiffs alleged that the defendant had failed to act as a reasonably prudent operator, and thus breached the implied covenants.  858 P.2d 66, 72 (N.M. 1993).  The contract between the parties, however, "specified that 'the nature and extent of all work done by [the defendant] on the Mining Lands and the time and manner of doing the same shall rest in the sole judgment and discretion of [the defendant]." *Id.* at 81.  The New Mexico Supreme Court held that the trial court had erred in enforcing implied covenants that were inconsistent with the express provisions of the parties' written agreement granting the defendant sole discretion to make operational decisions.  *Id.*  The court ruled that "when the contract between the parties speaks to the obligation sought to be implied, courts will not write that implied obligation into the contract." *Id.* at 80.[2]

Under Colorado law, where a contract expressly grants one party discretion in its performance, that party must perform its contractual obligations in good faith.  *See*

---

[2] This principle is consistent with the well-established rule that the implied covenant of good faith and fair dealing may supplement but not contradict the express terms of a contract.  *See McDonald v. Zions First Nat'l Bank,* 348 P.3d 957, 967 (Colo. App. 2015).

*Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).  The implied covenant of good

faith and fair dealing is violated only "[w]hen one party uses discretion conferred by the

contract to act dishonestly or to act outside of accepted commercial practices to deprive

the other party of the benefit of the contract …."  *McDonald*, 348 P.3d at 967.  Because

the *Holman* Settlement grants Noble the sole discretion to modify the POP contracts,

Phelps cannot establish a breach of contract—or a breach of the implied covenant of

good faith and fair dealing—without demonstrating that Noble acted in bad faith.

**B.    Because Noble's and Phelps's interests were aligned, Noble's business decisions will stand absent facial imprudence or bad faith.**

A lessee is subject to implied covenants to drill, develop, and operate in a

manner that "would be reasonably expected of all operators of ordinary prudence,

having regard to the interests of both lessor and lessee."  *Davis v. Cramer*, 808 P.2d

358, 363 (Colo. 1991).  Where the interests of the lessee and the lessors are aligned,

however, such as in marketing the product, a "less onerous" standard applies.  Williams

& Meyers, Oil and Gas Law § 856.3.  As explained in that treatise:

> The  greatest  possible leeway should    be  indulged the lessee in h    is
> decisions  about marketing gas,  assuming  no conflict of interest between
> lessor  and lessee.  Ordinarily, the in   terests  of the lessor and lessee wil   l
> coincide; the lessee will   have  everything to gain and nothing to lose by
> selling the product.

*Id.*[3]  This standard "approaches a good-faith test."  *Id.*  There are two reasons for this.

First, there is no divergence of interest between the lessee and lessors in seeking to

market the oil or gas—"both want the best contract that can be had; they [may] simply

---

[3] *Accord Garman v. Conoco, Inc.*, 886 P.2d 652, 661 n.28 (Colo. 1994); *SEECO, Inc. v. Hales*, 22 S.W.3d 157, 170-71 (Ark. 2000).

disagree in their estimates of what kind of contract can be obtained and how to go about getting the best offer." *Id.* Second:

> There is a great risk that close judici al supervision of the lessee's conduct in selling gas will inhibit his exer cise of his best judgment to the detriment of both landowner and operator. Scruti ny of lessee's actions by judges (or, worse, juries) in the light of after-acquired know ledge will tend to encourage the operator to take the least hazardous and perhaps least profitable course of action. It is u nnecessary to impose this conser vatism on the operator when his interes t in se lling the gas is fully identified with that of his landowner.

*Id.*[4] Here, the interests of Noble and its royalty owners were entirely aligned: both wanted to sell the natural gas and NGLs at the highest price available, and it was in the interest of both to obtain as favorable settlement terms from DCP as possible concerning the disputed issues in the DCP Audit.

> 1.     *The DCP Settlement was not patently imprudent.*

There was nothing imprudent about the DCP Settlement suggesting bad faith. Noble obtained substantial value for itself and its royalty owners by renegotiating its POP contracts to ████████████████████████████████ ████████████████████████. (Noble's Resp. to Pl.'s Interrog. No. 16. at 2-5; Sigdestad Dep. 125:8-25, 126:24-127:15, 128:13-22, 129:8-16, 136:10-16.) The revenue increase was significant: Noble internally estimated the net present value of the renegotiated contracts at ████████. (*See* Oct. 26, 2009 Email at Noble.Phelps 002685.) And, the value of the new POP contracts has been greater than anticipated. Noble's estimate at the time of settlement was based on flat sales volumes, but the

---

[4] *See also* Gary B. Conine, *The Prudent Operator Standard: Applications Beyond the Oil and Gas Lease*, 41 Nat. Resources J. 23, 37 (2001); *Robbins*, 785 P.2d at 116.

volume of gas produced has more than doubled since then.  (Sigdestad Decl. ¶ 9.)

Royalty owners, including Phelps, have benefitted and will continue to benefit from the

renegotiated POP contracts through increased royalty payments.  In addition, DCP

committed to ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████. (Noble's Resp. to Pl.'s Interrog. No. 16 at 2-5; Smith Dep. 68:2-

69:11.)  On these facts, Phelps cannot show Noble acted in bad faith or in a patently

imprudent manner in settling with DCP.

Moreover, while Phelps maintains that Noble "should have" recovered from DCP

the entire amount identified in the DCP Audit in a lump sum cash payment,[5] a plaintiff

lessor cannot establish a breach of the implied covenant to market simply by asserting

that a lessee should have gotten a better deal.  Rather, a plaintiff lessor must

demonstrate that a better deal was reasonably available.  *Watts v. Atl. Richfield Co.*,

115 F.3d 785, 794-95 (10th Cir. 1997) ("To survive a motion for summary judgment,

therefore, Lessors must 'set forth specific facts showing that there is a genuine issue for

trial'" that a higher price was available at the time of the agreement.).  Phelps has no

evidence that more favorable settlement terms were reasonably available to Noble.

(Phelps Dep. 131:16-132:1.)  And the undisputed evidence demonstrates they were not.

---

[5] *See* First Am. Compl. ¶ 67 ("Because Noble failed to recover the full amount of sale proceeds from DCP based on DCP's sales of Residue Gas, NGLs, and condensate attributed to the gas Noble produced from Phelps' and the Class' wells, Noble failed to pay royalties to Phelps and the Class based on … 100 percent of the proceeds which DCP should have paid Noble ….").

Noble identified a number of potential underpayment issues, but DCP disputed their validity and maintained that it had not underpaid Noble.  (*See* discussion of opposition to audit claims in Smith Dep. 33:23-50:11 and Sigdestad Decl. Ex. 4.)  Noble believed that DCP would not consider settling the audit issues with a cash settlement. (Sigdestad Decl. ¶ 7.)  Under these circumstances, the DCP Settlement was not only the best option available, it was the only option available.[6]

> 2.    There is no evidence that Noble acted in bad faith.

Phelps has no evidence that Noble acted in bad faith in entering the DCP Settlement.  Phelps concedes that it has no information indicating that Noble has been dishonest in its dealings (Phelps Dep. 133:14-17), that Noble intended to harm Phelps or any other royalty owners (*id.* 133:7-16), or that Noble acted outside accepted commercial practices in negotiating the DCP Settlement (*id.* 132:11-133:6).  This is not a situation that involved "self-dealing" or where Noble structured the settlement in a manner that would benefit Noble to the detriment of the Class Members.[7]  Rather, the

---

[6] To the extent Phelps maintains that Noble should have sued DCP to recover the entire ███████, this argument ignores that Noble and the royalty owners depend on DCP to provide post-wellhead services, and a lawsuit would have compromised that long-term relationship.  (Sigdestad Dep. 125:8-25; Smith Dep. 21:9-22:6.)  And, of course, the outcome of such a theoretical lawsuit is unknown.  Indeed, when another producer sued DCP over similar claims, its ultimate settlement was not materially better than that obtained by Noble.  (Smith Dep. 77:25-81:17.)

[7] In cases of evident self-dealing or a conflict of interest, courts scrutinize the actions of the lessee more closely.  *See* Williams & Meyers, Oil and Gas Law § 856.3 ("[A] stricter standard has been imposed on the lessee where evidence demonstrated that the interests of the lessor and the lessee did not coincide, *e.g.*: where the lessee acted in a dual capacity as both buyer and seller, where the lessee's conduct was based on collateral benefit under other leases, or where the lessee's sale to a wholly owned

royalty owners benefitted from the DCP Settlement along with Noble: the agreement was designed to substantially increase payments on the sale of Noble's natural gas and NGLs going forward, and to concurrently increase the volume of product sold. (Noble's Resp. to Pl.'s Interrog. No. 16 at 2-5; Sigdestad Dep. 126:24-127:15, 128:13-22, 129:8-16, 136:10-16.) Increased revenues to Noble means increased payments to royalty owners. Noble did not receive any consideration in the DCP Settlement that did not also benefit royalty owners like Phelps. Thus, Phelps cannot show that Noble acted in bad faith in entering into the DCP Settlement.

## **CONCLUSION**

For the foregoing reasons, Noble respectfully requests that the Court grant its motion for summary judgment and dismiss all of Plaintiff's claims against Noble with prejudice.

Dated this 1st day of March, 2016.

<div style="margin-left:40%">

*s/ Jonathan Rauchway*

Michael J. Gallagher
Jonathan W. Rauchway
David C. Holman
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, Colorado 80202
Telephone: 303 892 9400
Facsimile: 303 893 1379
Email: mike.gallagher@dgslaw.com
         jon.rauchway@dgslaw.com
         david.holman@dgslaw.com

Attorneys for Defendant Noble Energy, Inc.

</div>

---

subsidiary was found to be a 'sham,' or where the lessee may benefit from a settlement of a gas purchase contract to the exclusion of the royalty owner.").

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **MOTION FOR SUMMARY JUDGMENT** was filed and served via the ECF e-file system on this 1st day of March, 2016, upon the following:

Katherine Toan
Colorado Environmental Law
1434 Spruce Street, Suite 223
Boulder, CO 80302
kate.toan@gmail.com

George A. Barton
Robert G. Harken
Law Offices of George A. Barton, P.C.
7227 Metcalf, Suite 301
Overland Park, KS 66204
gab@georgebartonlaw.com
rob@georgebartonlaw.com

Daniel M. McClure
Norton Rose Fulbright US LLP
1301 McKinney, Ste. 5100
Houston, TX 77010
dan.mcclure@nortonrosefulbright.com

Matthew D. Spohn
Norton Rose Fulbright US LLP
1200 17th Street, Ste. 1000
Denver, CO 80202
matthew.spohn@nortonrosefulbright.com

*s/ Amanda Melillo*
Amanda Melillo