IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
12/7/15
JEFFREY P. COLWELL, CLERK

PHELPS OIL AND GAS, LLC, on behalf of itself and a class of similarly situated royalty owners,

    Plaintiff,

v.

NOBLE ENERGY, INC.

and

DCP MIDSTREAM, LP,

    Defendants.

Case No. 14-cv-2604-REB-CBS

## REVISED FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Phelps Oil and Gas, LLC ("Phelps"), on behalf of itself and the class of similarly situated persons as described herein, brings this first amended class action complaint for breach of contract and breach of the implied duty of good faith and fair dealing against Defendant Noble Energy, Inc., ("Noble"), and for unjust enrichment, civil theft, and conversion against Defendant DCP Midstream, LP ("DCP").

### JURISDICTION, VENUE, AND PARTIES

1. Phelps is a Colorado limited liability company with its principal place of business located at 280 South High Street, Denver, Colorado 80209.

2. Phelps brings this action on behalf of itself and a class of similarly situated persons which is defined as: (1) the members of the settlement class ("the *Noble* settlement class") in a class action case styled *Holman et al. v. Noble et al.*, Case No. 03 CV 9 (Weld County, Colorado), which was previously litigated against Noble in the District Court for Weld County, Colorado ("the *Noble* class action") and which was resolved on a

class-wide basis pursuant to a class settlement agreement which was executed in February 2007 ("the *Noble* class settlement agreement"); and (2) who have received any royalty payments from Noble since January 1, 2008, based on payments made by DCP to Noble under a percentage of proceeds gas purchase agreement ("percentage of proceeds agreement").

3. Phelps was a named plaintiff in the *Noble* class action, and a member of the *Noble* settlement class. The claims on behalf of the *Noble* settlement class which Phelps asserts in this first amended class action complaint against Noble and DCP are claims which satisfy the requirements of Fed .R. Civ. P. 23(b)(3).

4. Noble is a Delaware corporation with its principal place of business located at 1001 Noble Energy Way, Houston, Texas 77070. Noble also conducts substantial business in the State of Colorado at 1625 Broadway, Denver, Colorado 80202.

5. DCP is a limited partnership duly organized and existing under the laws of the State of Delaware, with a principal place of business located at 370 17th Street, Suite 2500, Denver, Colorado 80202.

6. This case had originally been properly filed in state court before the District Court for City and County of Denver, Colorado, and is now before this Court based on DCP's notice of removal asserting that this Court has subject matter jurisdiction based on diversity between Plaintiff and the Defendants pursuant to 28 U.S.C. § 1332(a). Phelps filed a motion for remand based on its argument that the Court does not have subject matter jurisdiction because the $75,000 threshold had not been met. The Court denied Phelps' motion for remand and retained subject matter jurisdiction over this case.

7. Noble and DCP have conducted substantial business transactions in the state of Colorado and the acts and conduct giving rise to the claims asserted in this first amended class action complaint occurred in Colorado.

8. Pursuant to 28 U.S.C. § 1391 venue is proper in this Court.

## CLASS ACTION ALLEGATIONS

9. The number of persons in the proposed Class is so numerous that joinder of all such persons in this litigation is impractical.

10. There are numerous questions of law and fact which are common to the Class.

11. The claims of Phelps are typical of the claims of the other Class members.

12. Phelps and its attorneys will fairly and adequately protect the interest of the Class, and Phelps' interests in this litigation do not conflict with the interests of other Class members.

13. The common issues of law and fact for the claims at issue predominate over any individual issues which may exist.

14. The maintenance of this case as a class action is superior to other methods for the fair and efficient adjudication of the Class members' claims against the defendants.

## GENERAL ALLEGATIONS

15. Phelps is a business which for many years received royalties from Noble. Phelps received such royalties under a royalty agreement which is a type of royalty agreement covered under the *Noble* class settlement agreement. Phelps has received royalties from Noble since January 1, 2008 which are subject to the terms of the *Noble* class settlement agreement.

16.     The defined settlement class of royalty owners who are bound by the terms of the *Noble* class settlement agreement include the individuals and entities as follows:

> All individuals and entities, private or public, to whom Noble has paid or currently is paying Royalties (either directly or indirectly through Duke Energy Field Services ("Duke") or Duke's predecessors or successors, and either on its own behalf or on behalf of Other Working Interest Owners) under Leases on Natural Gas and Liquids produced since January 1, 1997 from wells located in the Subject Counties, according to the business records maintained by Noble.  The settlement class excludes Noble, the federal government, legally recognized Indian tribes, the *Ace-Davis* Plaintiffs, any persons or entities that own a working interest in any well in the Subject Counties operated by Noble, and any person who currently serves as judge in either of the Civil Actions and their spouse.

17.     The above-referenced "Settlement Class" is referred to in this complaint as "the Class."  Phelps brings this action on behalf of the Class and seeks Fed. R. Civ. P. 23(b)(3) certification of the Class.

18.     As part of the *Noble* class settlement agreement, Noble and members of the Class agreed upon a future royalty calculation method by which Noble pays future royalties to the members of the Class for natural gas and natural gas liquids ("NGLs") that Noble produces in Adams, Boulder, Broomfield, Larimer, and Weld Counties in Colorado after January 1, 2008.  As part of this future royalty calculation method, in those situations where Noble has entered into a percentage of proceeds agreement with a provider of post-wellhead services, Noble agreed to pay the members of the Class a royalty based on 100 percent of the amount which the post-wellhead service provider paid over to Noble, and also based on 50 percent of the amount of sales proceeds retained by the provider of such post-wellhead services.

19.     Thus, by way of example, in situations where DCP provides the post-wellhead services such as gathering, compressing and processing for Noble pursuant to

4

a percentage of proceeds agreement, the Class is entitled to be paid royalties on 100 percent of the dollar amounts which DCP returns to Noble, plus 50 percent of the amount of sale proceeds DCP retains as the provider of post-wellhead services. Thus, to the extent that DCP has been unjustly enriched by failing to pay the full amounts which DCP owed to Noble under such percentage of proceeds agreements, Phelps and the members of the Class have been damaged because they been underpaid their royalties under the terms of the *Noble* class settlement agreement.

20.     The *Noble* class settlement agreement was entered into on or about February 15, 2007. The District Court for Weld County, Colorado approved the *Noble* class settlement agreement by order and judgment entered on June 11, 2007.

21.     Noble owns and holds interest in certain oil and gas leases located in Adams, Boulder, Broomfield, Larimer and Weld Counties in Colorado (the "Leases").

22.     From these Leases, Noble produces natural gas, associated NGLs and condensed liquid hydrocarbons ("Condensate").

23.     Before Noble's natural gas can be sold, it has to be processed to remove impurities and to separate the liquid hydrocarbons from the natural gas stream. At the point of extraction, the natural gas generally contains methane, ethane, propane, butanes, pentanes, and higher molecular weight hydrocarbons.

24.     Gas processing involves the separation of the natural gas stream into the gaseous components and the liquid components referenced above. After processing, the gaseous hydrocarbons are sold as "Residue Gas." The liquid components, otherwise known as NGLs, may be fractionated into their separate components or sold together.

25. Noble sells its natural gas to DCP pursuant to various percentage of proceeds agreements.

26. DCP gathers and processes Noble's natural gas along with the natural gas of other oil and gas producers. The percentage of proceeds agreements provide for a process under which Noble is allocated its proportionate share of the Residue Gas and NGLs attributed to Noble's natural gas. As set forth in the percentage of proceeds agreements, DCP is obligated to pay Noble a percentage of the proceeds on the sale of the Residue Gas and NGLs (sometimes referred to as "Plant Products").

27. As a general matter, natural gas produced from certain lands and/or wells is "dedicated" to a particular percentage of proceeds agreement. Accordingly, DCP pays Noble for the natural gas produced by a particular well based upon the terms of the percentage of proceeds agreement to which that natural gas is dedicated.

28. Noble and DCP identify the percentage of proceeds agreement using a numbering system which includes a prefix of either "WEL" or "GPA," which is then followed by a series of numbers.

29. The percentage of proceeds agreements give Noble the right to audit DCP's accounting records and other data for the purpose of determining whether DCP has properly paid Noble for its natural gas under the percentage of proceeds agreements.

30. Noble conducted audits of DCP's accounting records and other data and discovered that DCP has failed to properly pay Noble for its Residue Gas, NGLs, and Condensate by failing to adhere to the requirements of the percentage of proceeds agreements.

31. Within its gathering system, DCP has installed equipment to capture, contain, and measure hydrocarbon vapors emanating from the gas, including Noble's natural gas. This equipment is generally referred to as the Vapor Recovery Units ("VRUs").

32. When allocating Residue Gas and NGLs to Noble and other producers, DCP allocated volumes and revenues of these VRUs just as if the VRUs were producing wells.

33. The VRUs did not produce hydrocarbons; rather, they simply collected and contained the hydrocarbons already included in Noble's natural gas and the gas of the other producers.

34. Allocation of Residue Gas and NGLs to these VRUs diluted Noble's share of the amount of such products and related revenues.

35. DCP retained all revenues associated with the volumes of Residue Gas and NGLs allocated to the VRUs.

36. DCP's allocation of Residue Gas and NGLs to the VRUs and DCP's related retention of the revenues attributable to such volumes was a breach of the percentage of proceeds agreements.

37. Ethane separated from the natural gas stream can be sold either in its liquid form as a NGL or it can be reintroduced into the gaseous stream and sold as Residue Gas.

38. DCP reintroduced ethane into the gaseous stream and sold it as Residue Gas. DCP, however, did not pay Noble for the ethane based on the percentage of

proceeds that Noble was to receive for Residue Gas. Instead, DCP paid Noble the percentage of proceeds it was to receive for NGLs.

39. Many of the percentage of proceeds agreements provided that Noble receives a lower percentage of proceeds on NGL revenue compared to Residue Gas revenue.

40. DCP's practice of ethane reintroduction and sale as Residue Gas without proper payment to Noble based on the percentage of proceeds that Noble was to receive for Residue Gas was a breach of the percentage of proceeds agreements which provided Noble a greater percentage of revenues for Residue Gas as compared to the revenues from the sale of NGLs.

41. Certain liquid hydrocarbons condense within DCP's natural gas gathering system, which DCP removed upstream of the inlets to the gas processing plants. These condensed liquid hydrocarbons are commonly referred to as "drip" or "Condensate."

42. Under the percentage of proceeds agreements, the Condensate should have been treated as a NGL and Noble should have received proceeds on the sale of the Condensate based on the percentage of proceeds specified for NGLs.

43. DCP, however, retained ownership of all Condensate collected throughout the gathering and processing of Noble's natural gas and retained all proceeds from the sale of the Condensate.

44. DCP's retention of the proceeds for Condensate attributable to Noble's natural gas was a breach of the percentage of proceeds agreements.

45. Further, DCP used the producers', including Noble's, Residue Gas to stabilize the Condensate collected and retained by DCP. DCP, however, did not

8

compensate Noble for the use of Residue Gas attributable to Noble's natural gas in the stabilization of the Condensate.

46. DCP's failure to pay Noble for its use of Noble's Residue Gas in the stabilization of the Condensate is a breach of the percentage of proceeds agreements.

47. At all relevant times, DCP regularly operated its gathering system in excess of the Contract Pressure set forth in each percentage of proceeds agreements.

48. Operation of DCP's gathering system above Contract Pressure prevented Noble from being able to deliver its gas to DCP's gathering and processing facilities and caused significant damage to Noble, including DCP's failure to provide Noble with excess Contract Pressure discounts.

49. DCP's failure to maintain Contract Pressure in its gathering system and provide Noble with the excess Contract Pressure discounts are breaches of the percentage of proceeds agreements.

50. At all relevant times, DCP charged Noble fees in excess allowed by the percentage of proceeds agreements for transportation and fractionation of NGLs, charged Noble for other producers' gathering fees, charged Noble for hedging costs which were not allowed under the percentage of proceeds agreements, and otherwise under allocated the revenues owed to Noble pursuant to the percentage of proceeds agreements.

51. These practices of DCP described in paragraph 50 were in breach of the percentage of proceeds agreements.

52. On July 8, 2009, Noble sent an audit letter to DCP which stated that DCP failed to properly pay Noble for its Residue Gas, NGLs, and Condensate and adhere to the contractual provisions of the percentage of proceeds agreements.

53. After July 8, 2009, Noble and DCP began negotiations to resolve the claims set forth in the July 8, 2009 audit letter, to compensate Noble for amounts it should have been paid for its Residue Gas, NGLs, and Condensate under the contractual provisions of the percentage of proceeds agreements, and to address new issues surrounding the gathering and processing of Noble's natural gas which did not exist at the time the percentage of proceeds agreements were executed.

54. On or about March 15, 2010, Noble and DCP executed a settlement agreement which purported to resolve the claims set forth in the July 8, 2009 audit letter; however, the settlement agreement did not benefit Phelps or the Class.

55. As a result of the March 15, 2010 settlement agreement between Noble and DCP, Noble discounted the amounts DCP owed and was still required to pay Noble under the percentage of proceeds agreements, and waived its right to any cash distribution of the amounts DCP owed and was required to pay Noble under the percentage of proceeds agreements.

56. Because DCP did not pay, and because Noble did not receive, the actual amount of sale proceeds owed under the percentage of proceeds agreements as outlined in the July 8, 2009 audit letter, Phelps and the Class have not been paid the full amount of royalties they are owed pursuant to the *Noble* class settlement agreement.

57. The percentage of proceeds agreements recognized that the members of the Class are entitled to distribution of the sale proceeds as owners of interests in the

Residue Gas, NGLs and Condensate from the amounts payable to Noble under the percentage of proceeds agreements. DCP and Noble therefore knew or should have known that DCP's efforts to retain the sale proceeds owed to Noble would adversely affect Phelps and the Class because Noble's payments of royalties to Phelps and the Class were dependent upon the amounts payable to Noble under the percentage of proceeds agreements.

58.   Neither DCP nor Noble made any efforts to notify the members of the *Noble* settlement class that their ownership interest in the gas was affected by DCP underpaying Noble on DCP's sales of Noble's Residue Gas, NGLs, and Condensate, and affected by the settlement agreement between DCP and Noble.

59.   Phelps and the Class have not been paid royalties based on the amounts which DCP should have paid Noble pursuant to the percentage of proceeds agreements, nor based on the values referenced in the settlement agreement between DCP and Noble. Neither DCP nor Noble have made any efforts to reimburse the Class for their royalties which have been underpaid.

**FIRST CLAIM FOR RELIEF**
**(NOBLE'S BREACH OF CONTRACT)**

60.   Phelps adopts and incorporates all allegations contained in Paragraphs 1-59 as fully set forth herein.

61.   Phelps and the members of the Class have a class settlement agreement with Noble that is valid and enforceable.

62.   Noble has materially breached the terms of the *Noble* class settlement agreement and the terms of the applicable Royalty Agreements by failing to pay the

royalties owed to Phelps and the Class based on fifty percent of the proceeds retained by DCP, and based upon 100 percent of the amounts which DCP should have paid Noble.

63. Noble has therefore breached the provisions of the applicable Royalty Agreements and the *Noble* settlement agreement.

64. Phelps and the Class have sustained substantial damages as a direct consequence of such breaches, and are thereby entitled to judgment in their favor against Noble and an award of damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (NOBLE'S BREACH OF ITS IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING)

65. Phelps adopts and incorporates all allegations contained in Paragraphs 1-64 as fully set forth herein.

66. Pursuant to the *Noble* class settlement agreement and Colorado law, Noble has a duty of good faith and fair dealing to pay Phelps and the Class their royalties based on 50 percent of the proceeds retained by DCP, and based on 100 percent of the proceeds which DCP should have paid Noble pursuant to the percentage of proceeds agreement.

67. Because Noble failed to recover the full amount of sale proceeds from DCP based on DCP's sales of Residue Gas, NGLs, and condensate attributed to the gas Noble produced from Phelps' and the Class' wells, Noble failed to pay royalties to Phelps and the Class based on 50 percent of the proceeds retained by DCP, and based on 100 percent of the proceeds which DCP should have paid Noble pursuant to the percentage of proceeds agreements as outlined in the July 8, 2009 audit letter.

68.     By failing to pay royalties owed to Phelps and the Class based on the actual value of the Residue Gas, NGLs, and condensate, Noble has breached its duty of good faith and fair dealing owed to Phelps and the Class.

69.     As a direct consequence of Noble's breach of its implied duty of good faith and fair dealing, Phelps and the Class have suffered substantial damages and are entitled to judgment in their favor and against Noble in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (CIVIL THEFT AGAINST DCP)

70.     For its claim for civil theft under C.R.S. § 18-4-405 against DCP, Phelps adopts and incorporates all allegations contained in Paragraphs 1-69 as fully set forth herein.

71.     Based on the language of the percentage of proceeds agreements and the normal course of dealing in oil and gas production in Colorado, DCP knew or should have known that Noble's payments of royalties to Phelps and the Class were dependent upon the amounts payable to Noble pursuant to the percentage of proceeds agreements.

72.     Without authorization from Phelps or the Class, DCP knowingly obtained control over the value of the amounts of Phelps' and the Class' royalties which were not paid to Phelps and the Class under the *Noble* class settlement agreement when DCP failed to pay Noble the full amounts required under the percentage of proceeds agreements.

73.     DCP knowingly obtained control over Phelps' and the Class' royalties with the specific intent to permanently deprive Phelps and the Class the benefit of being paid the full amount of their royalties based on the amounts which should have been paid by DCP to Noble under the percentage of proceeds agreements, which requires DCP to pay

13

Phelps and the Class the full value of the royalties that have not been paid under the *Noble* class settlement agreement, plus all other amounts Phelps and the Class are entitled to under C.R.S. § 18-4-405.

### FOURTH CLAIM FOR RELIEF
### (CONVERSION AGAINST DCP)

74. For its claim for conversion against DCP, Phelps adopts and incorporates all allegations contained in Paragraphs 1-73 as fully set forth herein.

75. Based on the language of the percentage of proceeds agreements and the normal course of dealing in oil and gas production in Colorado, DCP knew or should have known that Noble's payments of royalties to Phelps and the Class were dependent upon the amounts payable to Noble pursuant to the percentage of proceeds agreements.

76. DCP intentionally and without authorization, exercised dominion or ownership over the royalties which were not paid to Phelps and the Class when DCP failed to pay Noble the full amounts required under the percentage of proceeds agreements because Phelps and the Class were not paid the full amount of their royalties under the *Noble* class settlement agreement based upon the amounts which should have been paid by DCP to Noble.

77. DCP's unauthorized exercise of dominion or ownership over such property under the circumstances requires DCP to pay Phelps and the Class the full value of the royalties which have not been paid, and Phelps and the Class are entitled to an award of punitive damages based on DCP's conversion of the royalties which have not been paid to them.

## FIFTH CLAIM FOR RELIEF
### (UNJUST ENRICHMENT AGAINST DCP)

78. Phelps adopts and incorporates all allegations contained in Paragraphs 1-77 as fully set forth herein.

79. In not paying the full amount of sale proceeds owed to Noble, Phelps, and the Class, DCP has unjustly received benefits which include:

   a. Revenue resulting from DCP's failure to pay Noble the correct percentage of proceeds pursuant to the percentage of proceeds agreements;

   b. Residue Gas and NGLs resulting from DCP's allocated of volumes to its Vapor Recovery Units;

   c. Revenues and fees resulting from DCP's practice of ethane reintroduction in the Residue Gas stream without proper payment to Noble for the value of such ethane;

   d. Revenue and fees resulting from DCP's practice of unnecessarily transporting and fractionating Noble's NGLs; and

   e. Gas Condensate attributable to Noble's Gas.

80. These benefits were unjustly received and retained by DCP at the expense of Phelps and the Class because Phelps and the Class were not paid the full amount of their royalties under the *Noble* class settlement agreement based upon the amounts which should have been paid by DCP to Noble under the percentage of proceeds agreements.

81. DCP's unjust retention of these benefits under the circumstances make it unjust for DCP to retain the benefit without commensurate compensation to Phelps and the members of the Class for their value.

## PRAYER FOR RELIEF

Wherefore, Phelps prays for the following relief on behalf of itself and the members of the Class based on amounts paid by DCP to Noble under the applicable percentage of proceeds agreements:

a. An order certifying Phelps' claims on behalf of the Class as a class action under Fed. R. Civ. P. 23(b)(3);

b. Judgment in favor of Phelps and the Class on each of their claims for relief against Noble and DCP as set forth herein;

c. An award of monetary damages to Phelps and the members of the Class as a result of Noble's breach of contract and breach of the implied duty of good faith and fair dealing;

d. An award of monetary damages to Phelps and the Class as a result of DCP's civil theft under C.R.S. § 18-4-405, conversion, and unjust enrichment;

e. An award of punitive damages for DCP's conversion;

f. An award of prejudgment interest to Phelps and the Class under the applicable Colorado statutory rate of eight percent per annum, compounded annually, pursuant to C.R.S. § 5-12-102(b), or at an appropriate rate of moratory interest pursuant to C.R.S. § 5-12-102(a), whichever prejudgment interest rate is higher, on any amount of royalties which have been underpaid to Phelps and the Class;

g. Attorneys' fees and the court costs associated with the prosecution of this lawsuit; and

      h. Such further relief as the Court deems appropriate.

## Demand For Jury Trial

Phelps and the Class demand a jury trial on all issues so triable.

Dated: December 2, 2015

/s/ Robert G. Harken
George A. Barton, MO Bar No. 26249
Robert G. Harken, MO Bar No. 52975
Law Offices of George A. Barton, P.C.
7227 Metcalf, Suite 301
Overland Park, KS 66204
(816) 300-6253
Fax: (816) 300-6259
Email: gab@georgebartonlaw.com
      rob@georgebartonlaw.com

ATTORNEYS FOR PLAINTIFF PHELPS OIL & GAS, LLC

## CERTIFICATE OF SERVICE

I certify that on December 2, 2015, I served a copy of the foregoing document on the following by Electronic Service by ECF on the following:

Michael J. Gallagher
Jonathan W. Rauchway
Terry R. Miller
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202

*Attorneys for Noble Energy, Inc.*

      /s/ Robert G. Harken
      Robert G. Harken